HALL, Judge.
Plaintiff, Robert E. Adams, a West Carroll Parish cotton farmer, sued Stoneville Pedigreed Seed Company, a producer and processor of cottonseed domiciled in Mississippi, seeking damages for expenses and lost profits allegedly sustained by plaintiff by virtue of a poor 1968 cotton crop resulting from defective or inferior seed produced by defendant and purchased by plaintiff from a retail seed dealer. Exceptions of no cause and no right of action and prescription were overruled by the trial court. After trial on the merits judgment was rendered rejecting plaintiff’s demands and plaintiff appealed. We affirm the judgment of the district court.
The exceptions of no cause and no right of action filed by defendant are based on contentions that there was no privity of contract between plaintiff and defendant. The exception of prescription is based on the contention that plaintiff’s action is one in redhibition and prescribed under the. provisions of LSA-C.C. Art. 2534 in that it was not brought within one year of the date of the sale of the seed. Because of our agreement with the district court in its conclusion that plaintiff failed to bear his burden of proof on the merits of the case, we pretermit a discussion of the correctness of the district court’s rulings on the exceptions.
*905 The issues to be considered, then, are purely factual. Was the seed defective or inferior and did plaintiff suffer any loss by reason thereof? The trial court’s evaluation of the evidence is entitled to great weight. The trial court’s comprehensive written opinion details the evidence, carefully analyzes it, and, in our judgment correctly resolves the factual issues. This appellate opinion will not repeat the evidence in the same detail, but will respond to the principal arguments made by appellant.
The cottonseed in question was processed by defendant in January, 1968, and was known as Stoneville 213, Lot 294. Lot 294 consisted of 2,000 fifty-pound bags which were sold by Stoneville to dealers in Mississippi, Louisiana, Arkansas and Texas.
Plaintiff bought 2,700 pounds of the seed from Barron Farm Supply in Oak Grove. Louisiana, on April 18, 1968, and purchased an additional 1,200 pounds on May 20 of that year. Barron had purchased 100 fifty-pound sacks from two dealers in Mississippi. He sold most of the remaining sacks to other farmers in the area.
During the latter part of April and first part of May, plaintiff planted three fields: (1) the Homeplace (field #1) containing about 51 acres; (2) the Malone Place (field #2) containing about 18 or 19 acres; and (3) the Richland Parish Place (field #3) containing about 122 acres. The planting resulted in a stand which plaintiff regarded as less than adequate— 50% or less. Other farmers in the area who observed the stand described it as “spotty”, “thin”, “bad” and “skippy”. Plaintiff elected to replant the Malone Place (field #2) and the Richland Parish Place (field #3), again using Stoneville 213 seed which he had purchased from Barron. After plowing up a small part of the Homeplace (field #1), plaintiff decided not to replant, the reason for his decision being in dispute. Plaintiff testified he left the Homeplace as a test plot at the direction of defendant’s representatives. Defendant’s representatives denied that they gave any such direction or suggestion.
The evidence shows the stand on the replanted fields was better than the first stand, although plaintiff’s opinion, corroborated to some extent by other farmers, was that the stands were still poor — about 50%. Defendant’s representatives described the stands on all three fields after the replanting as “good”, “fair” and “adequate”. Mr. Malone, owner of the land on which field #2 was planted described the second stand on that field as much better — 85% to 90%.
Ultimately, plaintiff ginned 67 bales of cotton from the Homeplace (field #1) containing about 51 acres. He ginned 30 bales of cotton from the Malone Place (field #2) which contained about 18 or 19 acres. All of the crop made on fields #1 and #2 was harvested. Only 23 bales of cotton were ginned from the Richland Parish Place (field #3) containing 122 acres. All of the crop from this field was never harvested because of its late maturity and bad weather at the time the crop was ready for harvesting.
Plaintiff contends he proved the defectiveness of the seed by proving (1) plaintiff is an experienced and above average farmer and properly planted the seed under favorable weather conditions; (2) there was a poor and inadequate stand after the first planting as shown by plaintiff’s testimony corroborated by that of several other farmers in the area; (3) other purchasers of Stoneville 213 seed from Mr. Barron also complained about poor stands and two purchasers also had to plant over; (4) two farmers next to the Homeplace planted their fields with another kind of seed and got a good stand and made a good crop; (5) germination tests showed the seed to be inferior; and (6) the fields produced poor or “short” crops.
Plaintiff’s stand after the first planting was obviously not up to his expectations. *906 However, there are many variables which go into determining whether or not a farmer achieves a good stand of cotton. Many factors determine the extent of germination of the seed. The Homeplace, which was not replanted, ultimately produced an average or better than average crop for the area. The fact that a stand is “skippy” to some extent does not necessarily mean there will be a poor yield as cotton has a tendency to compensate for skips. The yield from the Homeplace ultimately matched or bettered the yield from an adjacent farm which was described as having a perfect stand.
The evidence is that the stand on fields #2 and #3 after replanting was better than after the first planting. The Malone Place (field #2) ultimately produced an average or better than average crop for the area. The evidence does not show what field #3 would have produced if the crop had been fully harvested.
Although Mr. Barron of Barron Farm Supply testified that some other farmers to whom he sold Stoneville 213 also complained about their stands, no other farmer in the area bought a very large quantity. Also, none of the other farmers carried their complaints to defendant. The evidence is that out of the 2,000 fifty-pound sacks comprising Lot 294 which were sold throughout the four-state area, plaintiff was the only farmer who lodged a complaint with the defendant company.
Six germination tests were made on cottonseed out of Lot 294. In February, 1968, a sample composed of seed taken out of the sacks as they were made up by defendant was tested by the Mississippi State Laboratory which reported 84% germination. In March, 1968, a sample taken from a large quantity of the seed sold to Alexandria Seed Company was tested by the Louisiana State Laboratory, with a report of 93% germination. Two tests were made in early June of samples sent to the Louisiana State Laboratory from sacks of seed at Barron’s store or plaintiff’s place, each testing at 70% germination. A test in the latter part of June by the Louisiana State Laboratory showed a germination of 68%. Another test made about the middle of July by the Louisiana State Laboratory showed 84% germination.
As a result of the first test made by the Mississippi State Laboratory, the sacks of seed were tagged to show 80% germination by the defendant company. The evidence is that a 7% or 8% tolerance is allowed which means that of the six tests, three were within the tolerance and three were below. Defendant’s president, a well educated biologist with many years experience in the seed business, testified there is actually very little difference between 70% and 80% germination insofar as the effect on a cotton crop is concerned. The evidence does not show what effect, if any, a slightly substandard germination percentage might have on a projected cotton yield. The Louisiana State Seed Analyst testified that an 80% germination test result means that under ideal conditions one could expect 80% of the seed planted to germinate. He testified, however, that it is not possible to compare a laboratory test and the conditions prevailing there with the seed planted in an open field. There are too many factors which can affect germination.
Plaintiff’s primary evidence that he made a “short” crop or less than could be expected with good seed is a “boll-count” made by him on the Homeplace. By counting the bolls on limited areas of the field where the stand was good, plaintiff projected the amount of cotton which would have been produced from the field if it had a uniform good stand of cotton. The defendant’s expert witnesses denounced the boll-count method of measuring an anticipated yield because there are too many intervening and variable factors *907 which may affect the maturity and actual production of cotton. The accuracy of the method is also dependent on the areas selected for the count, the maturity of the bolls counted, and other factors entirely within the control of the person making the inspection. In any event, the boll-count made on the Homeplace would have little probative value in projecting a normal yield on the Malone Place which was about a mile and a quarter away and even less probative value in measuring the projected yield on the Richland Parish Place which was more than twenty miles away.
The Richland Parish Place was the last field planted at the first planting and also the last one replanted. It would have been later than the others in the ordinary course of affairs. The year 1968 was the first year that plaintiff had worked the Rich-land Parish Place and it was not shown what the condition of the farm was prior to his taking it over, that is, whether it had been subjected to good farming practices in prior years.
This case was expertly tried and briefed on behalf of plaintiff. It appeared that all available evidence was presented in an effort to prove the defective or inferior quality of the seed and that such resulted in a loss to plaintiff. Nevertheless, the evidence supporting plaintiff’s case is in many areas speculative and conjectural and we agree with the trial court that plaintiff has failed to carry his burden of proof by a preponderance of the evidence. He has failed to prove to a legal certainty that the seed was, in fact, of defective or inferior quality or that the quality of the seed caused him to lose profits which he normally could have expected to make with good quality seed.
For the reasons assigned, the judgment of the district court is affirmed at appellant’s costs.
Affirmed.